IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**ALBERT MERRILL SMITH**,

           Petitioner,

   v.

**STEVE BROWN**,

           Respondent.

Case No. 1:18-cv-01702-IM

**OPINION AND ORDER**

**IMMERGUT, District Judge.**

Petitioner Albert Merrill Smith ("Smith"), an individual in custody at Warner Creek Correctional Facility, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. For the reasons that follow, Smith's Amended Petition for Writ of Habeas Corpus (ECF No. 37) is DENIED, and this proceeding is DISMISSED, with prejudice.

///

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

### I.    Trial Court Proceedings

On July 7, 2009, a Josephine County grand jury returned an indictment charging Smith with two counts of Using a Child in a Display of Sexually Explicit Conduct and two counts of Sexual Abuse in the First Degree.[1] (Resp't Exs. (ECF No. 22), Ex. 102 at 1-2.[2]) The charges stemmed from Smith's alleged misconduct involving a child, B, on more than one occasion between 2005 and 2009. (*Id.*) On June 1, 2010, the grand jury returned a separate indictment charging Smith with two counts of Using a Child in a Display of Sexually Explicit conduct. (*Id.* at 3-4.) The additional charges stemmed from Smith's alleged misconduct involving another child, A, at some point between May and August 2009. (*Id.*)

The cases were consolidated (Resp't Ex. 129), and Smith proceeded to trial on both indictments in November 2010. The Oregon Court of Appeals summarized the proceedings, as follows:

> In 2009, when B was six years old, she reported to her mother that [Smith] had touched her on several occasions; [Smith] was [forty-one] years old at the time that B reported the touching. Since 2005, [Smith] had lived next door to mother and her two children and, over time, mother had gotten to know [Smith] personally and trusted him to watch B for brief periods of time while B played in [Smith]'s backyard. Mother estimated that defendant was alone with B over 100 times from 2007 to 2009. In July 2009, B and her friend, N, spent the day together in a wading pool at B's apartment and then went into B's bedroom to get dressed and ready for dinner. Mother found the girls in B's bedroom naked and touching each other. Mother told the girls to get dressed immediately and called N's mother to pick her up. After N left, mother asked B if what had happened in the bedroom had ever happened before, and B responded, "Only with [Smith]." Mother asked B what she

---

[1] The indictment originally included an additional charge — one count of Unlawful Sexual Penetration in the First Degree — that the State ultimately abandoned before trial. (Tr. (ECF Nos. 23, 24), at 240-43.)

[2] When citing to Respondent's Exhibits, the Court refers to the page numbers assigned listed in the lower right corner of each exhibit.

PAGE 2 – OPINION AND ORDER

meant by that statement, and B said that [Smith] had pulled her pants down, touched her, and photographed her "pee-pee." When mother asked B how many times that had happened, B responded, "A lot."

The next morning, mother called the Women's Crisis Support Team and arranged to meet with a police officer. That same day, Grants Pass Detective Pierce interviewed B at the Grants Pass Children's Advocacy and Treatment Center. During the interview, Pierce asked B if she knew anyone who had a "touching problem," and B responded that [Smith] had a touching problem and that he had taken pictures of her vagina. B explained that, when she was in [Smith]'s backyard, [Smith] had pulled down her pants and underwear and made her lie on her back while he took pictures of her. B said that she never saw the photographs because [Smith] deleted them. B also explained that, while her clothes were off, [Smith] touched her vagina with his hand. When Pierce asked her how many times that had happened, B responded that it had occurred more than one time. Pierce also asked B if any part of her body had touched [Smith]'s body, and B recounted that, on different occasions, [Smith] got on top of her and moved up and down while she was lying on a red mat in his backyard. B also stated that [Smith] would give her kisses. When asked if [Smith] ever gave her things, B responded that [Smith] gave her gum and stickers after he had touched her and taken photographs of her.

After the interview, Pierce, along with some other officers, went to [Smith]'s home to execute a warrant to search [Smith]'s residence, and [Smith] was home at that time. Pierce asked [Smith] if he would be willing to speak with her in a police van parked outside while the other detectives searched his house, and [Smith] agreed. In the van, Pierce advised [Smith] of his rights and then told him what B had said to her during the interview. In response, [Smith] admitted to knowing B, but denied taking photographs of B naked, touching her vagina, or taking photographs of B while she was naked, or simulating sexual acts on top of her. Pierce eventually asked [Smith] if he would continue their conversation at the Grants Pass Sheriff's Office, and [Smith] agreed.

Meanwhile, the other officers searched [Smith]'s bedroom and found nine computers, several video cameras, at least one digital camera, and five cell phones. The officers discovered "close to 500" photographs of clothed children, many of which depicted young girls. In [Smith]'s bedroom closet, there were items of children's clothing (including young girls' clothing) and toys; defendant did not have any children. The officers seized a fanny pack that [Smith] was wearing around his waist, containing a small digital camera, and later sent the camera for forensic analysis.

At the sheriff's office, [Smith] was first interviewed by Detective Auborn. During that interview, [Smith] admitted that he did, in fact, take photographs of B with her pants and underwear pulled down to her knees and that the photographs were taken about one year before. Although he had admitted to taking the photographs, [Smith] denied touching B, removing her clothing, or having simulated sexual acts on top of her. After [Smith] spoke with Auborn alone, Pierce came in to follow up with [Smith] about what he had just admitted to Auborn. During that second interview

with Pierce and Auborn, [Smith] gave some details about the photographs that he had taken of B, explaining that B was naked from the waist down to about her knees, and that he had taken the photographs in the side yard of his house. He also stated that he had deleted the photographs of B and acknowledged that taking the photographs was a "bad idea." At some point during the interview, [Smith] started talking about other photographs that he had taken of A, his second cousin's daughter, near a swimming pool, but explained that A was clothed in those photographs.

Some time later, the forensic analysis of [Smith]'s digital camera recovered two deleted photographs of A, who was naked from the waist down; A was two years old at the time the photographs were taken. The forensic analysis, however, did not recover any photographs of B.

[Smith] was charged by indictment in two separate cases. In Case No. 09-CR-0419, [Smith] was charged with two counts of using a child in a display of sexually explicit conduct based on [Smith] "knowingly compel[ling] and/or induc[ing]" B "to participate in sexually explicit conduct" and two counts of first-degree sexual abuse of B. In Case No. 10-CR-0323, [Smith] was charged with two counts of using a child in a display of sexually explicit conduct for "knowingly compel[ling] and/or induc[ing]" A "to participate in or engage in sexually explicit conduct."

At the consolidated trial, the state introduced a recording of Pierce's interview of B into evidence. B also testified as to [Smith]'s conduct. During her testimony, she stated that [Smith] had touched her "pee pee" with his hand on more than one occasion and also explained that [Smith] had pulled off her pants and underwear and taken pictures of her vagina while she was lying down on a red mat. She stated that, after [Smith] would touch her or take picture of her, he would give her a piece of gum. B recounted that, on one occasion, while her clothes were on, [Smith] had lain on top of her and moved "back and forth." When asked if [Smith] had ever given her kisses or hugs, B responded that, on one occasion, he had given her a "tongue kiss."

The state submitted the photographs of A into evidence. In those photographs, A was lying on the grass in her backyard next to a wading pool and was naked from the waist down. In one photograph, A was posed looking directly at the camera with her legs partially open, exposing her vagina; A was not smiling in the photograph. The other photograph is similar, except that it was taken from a slightly farther vantage point and A was looking away from the camera. In addition to the photographs of A, the state submitted as evidence approximately 500 photographs of children, children's clothing, and toys that the officers had discovered in [Smith]'s bedroom.

A did not testify at trial, and the state offered no witnesses regarding the taking of those photographs. However, A's mother did testify as to A's relationship with [Smith]. She explained that [Smith] stopped by their home every day and often took pictures while he was there. Although A wore diapers during that time, A's mother stated that A always wore clothes in public and would wear a bathing suit when she

went swimming in the wading pool in their backyard. To A's mother's knowledge, A was never naked in front of [Smith].

With respect to the charges involving A, the defense theory was that [Smith] did not take any photographs of A. [Smith] claimed that A's eight-year-old sister had taken the photographs, and that [Smith] deleted them once he discovered the photographs on his camera. And, although the state submitted Pierce's interviews of [Smith] (in which [Smith] had made incriminating admissions), [Smith]'s theory regarding the charges involving B was that [Smith] did not take any photographs of B naked and that, during his interview with Pierce and Auburn, he had mistakenly recounted the photographs of A when answering questions about the photographs involving B.

At the close of the state's case, [Smith] moved for a judgment of acquittal on two grounds. With respect to A, defense counsel contended, among other things, that the state failed to prove that [Smith] compelled or induced A to participate in sexually explicit conduct:

> "There's been no evidence that [Smith] compelled or induced [A] to do anything. All we have is a couple of pictures. At that—and there's—beyond that it's basically speculation or conjecture how she got there. There's no evidence that he took her pants down, there's no evidence that he placed her there, * * * basically the only evidence they have is that this is a deleted picture off of a camera that was seized from him."

With respect to B, defense counsel argued, among other things, that the state failed to prove that, based on evidence of unrecovered photographs, B participated in a display of sexually explicit conduct, which is defined under ORS 163.665(3)(f) to include a "[l]ewd exhibition of sexual or other intimate body parts."

The [trial] court denied both motions for judgment of acquittal, stating that, viewing the evidence in the light most favorable to the state, a jury could find [Smith] guilty. Afterward, the state agreed to submit the case to the jury only on the theory that [Smith] "induced" A and B to participate or engage in sexually explicit conduct. The jury was instructed to determine whether the state proved, beyond a reasonable doubt, that [Smith] "knowingly induced" A "to engage in sexually explicit conduct" and that he "knowingly induced" B "to participate in sexually explicit conduct." The jury ultimately found [Smith] guilty on two counts of using a child in a display of sexually explicit conduct based on the two photographs of A, two counts of using a child in a display of sexually explicit conduct based on evidence regarding the unrecovered photographs of B, and two counts of first-degree sexual abuse for conduct involving B.

*State v. Smith*, 261 Or. App. 665, 668-70 (2014). The trial court thereafter sentenced Smith to a custodial term totaling 145 months. (Resp't Ex. 101 at 3-6.)

///

PAGE 5 – OPINION AND ORDER

II.     **Direct Appeal**

Smith appealed, raising as error the trial court's denial of his motion for acquittal on all four counts of Using a Child in a Display of Sexually Explicit Conduct. (Resp't Ex. 103 at 2-3.) Section 163.670(1) of the Oregon Revised Statutes ("ORS") provides that "[a] person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels or induces a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording."

With respect to the two counts involving A, Smith argued that the evidence was insufficient to support a finding that he had "compelled or induced a child's participation in sexually explicit conduct" under ORS 163.670(1) because "there was no evidence of the circumstances within which [Smith] made the photographs [of A]." (*Id.* at 8.) With respect to the two counts involving B, Smith argued that there was insufficient evidence for a rational trier of fact to find that the State had proved that B "engaged in a lewd exhibition of her sexual or other intimate parts[,]" *i.e.*, sexually explicit conduct,[3] because the photographs of B were never recovered, and "nudity alone is insufficient to prove a lewd exhibition[.]" (*Id.*)

---

[3] "Sexually explicit conduct" is defined under ORS 163.665(3) as actual or simulated:

(a) Sexual intercourse or deviant sexual intercourse;

(b) Genital-genital, oral-genital, anal-genital or oral-anal contact, whether between persons of the same or opposite sex or between humans and animals;

(c) Penetration of the vagina or rectum by any object other than as part of a medical diagnosis or treatment or as part of a personal hygiene practice;

(d) Masturbation;

(e) Sadistic or masochistic abuse; or

(f) Lewd exhibition of sexual or other intimate parts.

In a written opinion, the Oregon Court of Appeals rejected Smith's arguments and affirmed

his convictions with respect to A, explaining:

> After examining the photographs, we conclude that a factfinder could reasonably infer that [Smith] persuaded or influenced A to engage in sexually explicit conduct. In both photographs, A is wearing a shirt with no pants, her legs are spread slightly apart, displaying her vagina toward the camera, and she is lying on her back with her head against the side of a swimming pool. A factfinder could also reasonably infer, based on A's facial expressions in the photographs, that she would not have posed herself in that position without being persuaded or influenced to do so.
>
> Moreover, the jury heard testimony from A's mother that defendant stopped by A's home every day and took pictures while he was visiting. Although A wore diapers during the time period that the photographs were taken, her mother testified that A always walked around with her clothes on and, to her knowledge, A was never naked in front of defendant. From her mother's testimony, it is reasonable for a factfinder to infer that A would not have been naked in the backyard with [Smith] near the wading pool unless [Smith] had persuaded or influenced her. Again, the photographs were recovered from [Smith's] digital camera, so there is a logical probability that [Smith] was the person who had persuaded or influenced A to pose in that manner. Therefore, we conclude that a factfinder could reasonably infer from the photographs, along with A's mother's testimony, that defendant persuaded or influenced A to engage in that sexually explicit conduct.

*State v. Smith*, 261 Or. App. 665, 675 (2014).

The Court of Appeals also rejected Smith's arguments with respect to B, explaining that

under Oregon law, "a lewd exhibition is one that would produce lust or sexual desire in the viewer,

as determined from the perspective of the person charged under the statute." *Id.* at 678. The

appellate court thus concluded that a jury could infer that the unrecovered photographs of B were

a lewd exhibition within the meaning of ORS 163.665(3):

> B explained in her interview with Pierce that [Smith] pulled down her pants and underwear and took pictures of her while she was lying on her back, exposing her vagina. In addition, B explained that [Smith] had touched her vagina, given her a "tongue kiss," and, on one occasion, lain on top of her while moving back and forth. From that additional evidence, a jury could infer that, when defendant took pictures of B's vagina, he intended the photographs to stimulate lust or sexual desire of viewers, namely himself. Accordingly, we conclude that the trial court did not err in denying [Smith's] motion for judgment of acquittal with respect to the charges regarding B[.]

PAGE 7 – OPINION AND ORDER

*Id.* at 678-79. The Oregon Court of Appeals thus affirmed Smith's convictions with respect to B.

*Id.* The Oregon Supreme Court denied review. *State v. Smith*, 355 Or. 880 (2014).

## III.    Post-Conviction Proceedings

Smith then sought postconviction relief.[4] (Resp't Ex. 113.) As amended by postconviction

counsel, Smith's petition for postconviction relief raised a number of claims based on the

ineffectiveness of trial counsel, the ineffectiveness of appellate counsel, and trial court error.

(Resp't Ex. 114.) After an evidentiary hearing, the post-conviction court denied relief. (Resp't Exs.

165, 166.)

> Smith appealed, presenting a single assignment of error, as follows:
>
> ASSIGNMENT OF ERROR: The post-conviction trial court erred when it denied
> petitioner relief on the claim that his trial attorneys were ineffective and inadequate
> for stipulating to the admission of other-acts evidence, including almost 500
> pictures of clothed children and children's toys and clothing discovered in
> petitioner's house.

(Resp't Ex. 167 at 2.) The Oregon Court of Appeals affirmed without opinion, and the Oregon

Supreme Court denied review. (Resp't Exs. 170, 171.)

## IV.    Federal Habeas Proceedings

On September 24, 2018, Petitioner filed a Petition for Writ of Habeas Corpus in this Court.

With the assistance of appointed counsel, Petitioner filed an Amended Petition for Habeas Corpus

(the "Amended Petition") on April 1, 2020, presenting four claims for relief with numerous

subparts. (Am. Pet. at 7-14.) Respondent urges this Court to deny habeas relief, arguing that the

majority of Petitioner's claims are untimely, procedurally defaulted, or both; and that to the extent

---

[4] Smith initially filed a petition for postconviction relief on October 9, 2014, prior to the issuance of the appellate judgment on October 14, 2014. (Resp't Exs. 109, 110.) Smith later filed a motion to dismiss the petition, presumably on that basis, which was granted on May 29, 2015. (Resp't Ex. 112.)

Petitioner fairly presented any of his claims, the state-court decisions denying relief on such claims are entitled to deference. (Resp. to Am. Pet. (ECF No. 44), at 7.[5])

## DISCUSSION

### I.    Exhaustion and Procedural Default

Respondent argues that Smith failed fairly to present several of his claims to Oregon's highest court, and because he can no longer do so, those claims are procedurally defaulted. (Resp. to Am. Pet. at 16-20.) Smith argues that the default of "subclaim 12(A)(1)" should be excused pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), but does not address Respondent's procedural default arguments with respect to any other claim. (Pet.'s Sur-Resp. to Sur-Reply and in Supp. of the Am. Pet. for Writ of Habeas Corpus (ECF No. 64), at 3-5.) This Court considers each of Smith's claims in turn.

#### A.    Legal Standards

A habeas petitioner generally must exhaust all remedies available in state court, either on direct appeal or through collateral proceedings, before a federal court may consider granting habeas relief. *See* 28 U.S.C. § 2254(b)(1)(A) (instructing that a court may not issue a writ of habeas corpus on behalf of an individual in state custody unless "the applicant has exhausted the remedies available in the courts of the State"); *see also Smith v. Baldwin*, 510 F.3d 1127, 1137 (9th Cir. 2007) (noting that a prisoner must first exhaust available remedies before a federal court may consider the merits of a habeas petition). Generally, a petitioner satisfies the exhaustion requirement "by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby 'afford[ing] the state courts a meaningful opportunity to

---

[5] When citing to the parties' briefing, the Court refers to the ECF page numbers to avoid confusion.

consider allegations of legal error.'" *Casey v. Moore*, 386 F.3d 896, 915–16 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986)) (alteration in original); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (holding that "[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete rounds of the state's established appellate review process").

If a petitioner failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, the claims have not been fairly presented to the state courts and are therefore not eligible for federal habeas corpus review. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In this respect, a petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or failed to raise the claim at the state level at all. *Carpenter*, 529 U.S. 446, 451(2000); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). An individual in state custody is barred from raising procedurally defaulted claims in federal court unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

    **B.**    **Analysis**

        **1.**    **Smith's First Claim for Relief — Sufficiency of Evidence and Actual Innocence**

            **a.**    **Sufficiency of Evidence**

In his first claim for relief, Smith alleges that "there was insufficient evidence to convict him of either of the two charged crimes under the required elements of Oregon law, and . . . he is both factually and legally innocent of those charges." (Am. Pet. at 7.) In his supporting brief, Smith

PAGE 10 – OPINION AND ORDER

clarifies that his first claim for relief targets only his convictions of Using a Child in a Display of Sexually Explicit Conduct — two counts for Smith's conduct involving B, and two counts for Smith's conduct involving A. (Pet'r's Br. in Supp. of the Am. Pet. (ECF No. 38), at 17.)

As summarized above, Smith challenged in his direct appeal proceedings the trial court's denial of his motion for judgment of acquittal based on the sufficiency of the evidence. With respect to his convictions concerning A, Smith argued that there was insufficient evidence to find that he had "compelled or induced" A to participate in sexually explicit conduct as required under ORS 163.670, because "there [was] no evidence that [he] removed A's clothing, that [he] positioned A on the grass, or that [he] somehow got A to remove her own clothing and pose for a picture." (Resp't Ex. 103 at 16-17.) Because there was no evidence that he "had any communication of any kind with A before taking two pictures of A[,]" Smith argued that "it [was] not possible to permit a jury's determination that [he] compelled A's behavior[,]" and thus the trial court erred in denying his motion for judgment of acquittal on those charges.

With respect to the convictions concerning B, Smith argued that "the photographs of B were never recovered and because B's testimony was only that [Smith] pulled her clothing to her knees and took pictures of her 'pee-pee,' . . . the state failed to prove that they were a 'lewd exhibition [of sexual or other intimate parts,]'" *i.e.*, sexually explicit conduct as defined by ORS 163.665. (Resp't Ex. 103 at 22.) Relying on the dissent in *State v. Evans*, 178 Or. App. 439 (2001), as well as the text, context, and legislative history of ORS 163.665, Smith asserted that mere nudity alone is not enough to prove a "lewd exhibition," and that the State must instead "prove that the nude depiction is an exhibition that would be perceived as lewd from the perspective of the average person observing the exhibition." (Resp't Ex. 103 at 23-34.) Smith thus argued that because the State presented "evidence of only child nudity[,]" and the Oregon "legislature intended something

PAGE 11 – OPINION AND ORDER

far more than mere child nudity to qualify as '[l]ewd exhibition of sexual or other intimate parts[,]'" the trial court erred in denying his motion for judgment of acquittal on the charges involving B.

The Oregon Court of Appeals rejected Smith's arguments, including his assertion "that whether something is a lewd exhibition depends on the *objective nature* of the child's conduct, not the subjective intent of the person who induces that conduct." *Smith*, 261 Or. App. at 678 (emphasis in original). In doing so, the appellate court "adhere[d] to [its] interpretation that a lewd exhibition [under Oregon law] is one that would produce lust or sexual desire in the viewer, as determined from the perspective of the person charged under the statute." *Id.*

Smith now presents to this Court sufficiency of evidence claims different than those he presented to the Oregon Court of Appeals. With respect to his convictions involving B, Smith argues that no "actionable image" of B was ever recovered, and therefore he "[f]actually . . . is not guilty of taking any such picture." (Pet'r's Br. at 18.) With respect to his convictions involving A, Smith now argues that the two photographs in which A's vagina is exposed do not constitute "sexually explicit conduct." (*Id.* at 18-21.) Specifically, Smith cites the Supreme Court's decisions in *New York v. Ferber*, 458 U.S. 747 (1982) and *Miller v. California*, 413 U.S. 15 (1973), arguing that Oregon's "lewd exhibition" standard is overbroad under the First Amendment, and that "a semi-nude photo of a [two] year old child laying on the grass near a pool in the summer, when no one (or thing) is touching her and she is not touching herself, cannot be deemed pornographic by an average person in the community." (*Id.* at 21.)

As explained above, Smith challenged his convictions involving B in the Oregon Court of Appeals based on his assertion that the State could not prove that the unrecovered photographs of B constituted "sexually explicit conduct," and not that he is factually innocent of taking

photographs of B. Similarly, Smith argued on direct appeal that there was insufficient evidence to prove that he "induced" A to engage in sexually explicit conduct, not that the photographs cannot be deemed pornographic under federal obscenity and child pornography standards. Indeed, Smith did not raise a federal claim at all. Smith therefore failed fairly to present his first claim for relief as argued, and because he can no longer do so, it is procedurally defaulted.[6] *See* OR. REV. STAT. 19.255(1) (requiring that "a notice of appeal must be served and filed within [thirty] days after the judgment appealed from is entered in the register"). Smith presents no argument to the contrary.

### b.    Actual Innocence

The nature of Smith's "actual innocence" claim is unclear because Smith does not specify whether he seeks to excuse procedural default through a gateway actual innocence claim under *Schlup v. Delo*, 513 U.S. 298 (1995), or intends to assert a freestanding claim of innocence.[7] To the extent Smith seeks to overcome the procedural default of his claims, he must present a "credible" claim of actual innocence by "support[ing] [his] allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Id.* at 324. Smith has not done so, and the default of his claims cannot be excused under *Schlup*.

---

[6] To the extent the arguments Smith asserts here are "substantially similar" to those fairly presented in state court, this Court is satisfied that the Oregon Court of Appeals' decision denying Smith's sufficiency of evidence claims was not objectively unreasonable, and therefore is entitled to deference.

[7] To the extent Smith asserts that he is "actually innocent" under a revised interpretation of "lewd exhibition," this Court declines to reinterpret an Oregon statute in a manner that is at odds with the interpretation reached by the Oregon courts. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (noting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

To the extent Smith seeks to assert a freestanding claim of actual innocence, the Supreme Court has yet to hold that such a claim is cognizable in a federal habeas proceeding. *McQuiggin v. Perkins*, 569, U.S. 383, 392 (2013). However, on several occasions both the Supreme Court and the Ninth Circuit have assumed, without deciding, that such a claim may exist in capital cases. *House v. Bell*, 547 U.S. 518, 554-55 (2006); *Herrera v. Collins*, 506 U.S. 390, 417-19 & 427 (1993); *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014); *see also Roberts v. Howton*, 13 F.Supp.3d 1077, 1113 (D. Or. 2014) (collecting cases). In so doing, the courts have opined that a petitioner must "'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Jones*, 763 F.3d at 1246 (*quoting Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997)); *see also House*, 547 U.S. at 555 (Supreme Court precedent implies that freestanding claim of actual innocence requires more convincing proof of innocence than *Schlup*). The petitioner's burden under this standard is "extraordinarily high" and requires a showing that is "truly persuasive." *Carriger*, 132 F.3d at 476 (quoting *Herrera*, 506 U.S. at 417). Assuming such a claim is cognizable, Smith's failure to establish a "gateway" claim of actual innocence necessarily means he has failed to meet the "extraordinarily high" standard required to establish a freestanding claim of actual innocence. Accordingly, this Court denies habeas relief as to Smith's "actual innocence" claim.

## 2. Smith's Second Claim for Relief — Ineffective Assistance of Trial Counsel

### a. Subclaim 12(A)

In subclaim 12(A) of the second claim for relief, Smith alleges that his trial attorneys were ineffective when they "failed to file a motion to suppress the evidence that was obtained in the search of Mr. Smith's home pursuant to an invalid warrant and/or . . . that was seized beyond the scope of any valid warrant." (Am. Pet. at 8; Pet'r's Br. at 21-23.) Specifically, in subclaim

12(A)(1), Smith alleges that counsel was ineffective in failing to challenge the validity of a search warrant authorizing the search of his home, which "had language that rendered it so broad as to make the warrant into a general warrant in violation of the Fourth Amendment." (Am. Pet. at 8-9). In subclaim 12(A)(2), Smith alleges that "[t]o the extent . . . the warrant was not an invalid general warrant, the police seized items that were beyond the terms of the warrant, including numerous photographs that were neither pornographic nor criminally actionable[,]" and that trial counsel was ineffective in failing to move to suppress such evidence. (*Id.* at 9.) In subclaim 12(A)(3), Smith alleges that trial counsel was ineffective for withdrawing his objection to the admission of evidence seized beyond the scope of the warrant "based on an agreement with the prosecutor, a stipulation pursuant to Oregon Evidence Code 404(3)[,] . . . [that] provided no tactical or legal benefit to Mr. Smith." (*Id.* at 9.)

Smith raised two similar claims in his postconviction proceedings, specifically challenging trial counsel's failure to file a motion to suppress evidence seized beyond the scope of the search warrant and trial counsel's improper stipulation to the admission of unlawfully seized evidence, *i.e.*, "hundreds of pictures of fully clothed young girls." (Resp't Exs. 114 at 5; 116 at 7-11.) The postconviction court denied relief on both claims. (Resp't Ex. 166 at 1.) Smith then appealed, but assigned as error only the postconviction court's denial of relief on his claim that trial counsel was ineffective in stipulating to the admission of "almost 500 pictures of clothed children and children's toys and clothing" recovered in the search of Smith's home. (Resp't Ex. 167 at 2.) Smith carried that single claim forward in his petition for review to the Oregon Supreme Court. (Resp't Ex. 169 at 13.)

Smith thus fairly presented subclaim 12(A)(3), his ineffectiveness claim concerning trial counsel's allegedly improper stipulation to the admission of other-acts evidence, and that claim is

more thoroughly addressed in Section II, *infra*. He concedes, however, that he failed fairly to present subclaims 12(A)(1) and 12(A)(2) — that trial counsel was ineffective in failing to move to suppress all evidence seized pursuant to an invalid warrant or to suppress evidence seized outside of the scope of the warrant, respectively — and thus they are procedurally defaulted. Smith seeks to overcome the default of subclaim 12(A)(1) pursuant to *Martinez v. Ryan*,[8] as discussed below.

### i.    Smith Fails to Demonstrate Cause Under *Martinez* to Excuse the Default of Subclaim 12(A)(1)

Smith concedes that subclaim 12(A)(1) — which alleges the ineffective assistance of trial counsel based on his failure to challenge the warrant authorizing the search of Smith's home as a constitutionally invalid general warrant — is procedurally defaulted, but argues that the ineffective assistance of postconviction counsel excuses the default. Although the ineffective assistance of post-conviction counsel generally does not constitute "cause" to excuse a procedural default, *see Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (holding that because there is no constitutional right to counsel in post-conviction proceedings, a petitioner "must 'bear the risk of attorney error that results in a procedural default'") (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)), the Supreme Court recognized a narrow exception to this general rule in *Martinez v. Ryan*: "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding,

---

[8] Smith does not attempt to overcome the default as to subclaim 12(A)(2). Nevertheless, this Court notes that because postconviction counsel presented to the postconviction court an ineffectiveness claim challenging trial counsel's failure to move to suppress evidence seized beyond the scope of the search warrant, Smith cannot overcome the default of subclaim 12(A)(2) under *Martinez* by establishing that postconviction counsel was ineffective in failing to raise it in his trial-level postconviction proceedings.

there was no counsel or counsel in that proceeding was ineffective." *Martinez*, 566 U.S. at 9; *see also Detrich v. Ryan*, 740 F.3d 1237, 1244 (9th Cir. 2013) (noting that under *Martinez*, "a procedural default by state [postconviction] counsel in failing to raise trial-counsel IAC is excused if there is 'cause' for the default"). This narrow exception applies in Oregon where, by law, ineffective assistance claims must be raised and addressed in a proceeding for postconviction relief. *See State v. Robinson*, 25 Or. App. 675, 550 P.2d 758 (1976) (holding ineffective-assistance claims are "properly resolved only in a postconviction proceeding"); *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) (acknowledging that Oregon requires claims for ineffective assistance to be raised in a collateral proceeding).

To establish cause to excuse procedural default under *Martinez*, Smith must show first that his underlying claim of ineffective assistance of trial counsel is substantial insofar as it has "some merit." *Martinez*, 566 U.S. at 14. Next, he must demonstrate that his postconviction attorney was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to raise the claim. "[T]o fulfill this requirement, a petition must not only show that [postconviction] counsel performed deficiently, but also that this prejudiced petitioner, i.e. that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2017). Such a finding would necessarily require the Court to conclude that there is a reasonable probability that the trial-level ineffective assistance claim would have succeeded had it been raised. *Id.*

Smith argues that his underlying ineffective assistance of counsel claim is "substantial" because his trial attorneys failed to challenge the validity of the warrant authorizing the search of his home, which included "language that rendered it so broad as to make the warrant into a general

PAGE 17 – OPINION AND ORDER

warrant in violation of the Fourth Amendment." (Am. Pet. at 8-9; Pet'r's Reply (ECF No. 52), at 8.) Smith argues that postconviction counsel's failure to "perceive and raise" this claim constitutes ineffective assistance under *Martinez*, and that had he raised this claim, there would have been a "strong possibility of success on the merits." (Pet'r's Reply at 10-11.)

The Fourth Amendment instructs that a search warrant must "particularly describe[e] the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. "'This particularity requirement makes 'general searches under [a warrant] impossible and prevents the seizure of one thing under a warrant describing another.'" *Unites States v. Bridges*, 344 F.3d 1010, 1016 (9th Cir. 2003) (quoting *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982)); *see also United States v. Sartin*, 262 F. Supp. 2d 1154, 1160 (D. Or. 2003) (explaining that the particularity requirement "prevents 'general, exploratory rummaging in a person's belongings' and helps to ensure that a search is confined to particularly described evidence relating to a specific crime for which there is probable cause") (quoting *Andresen v. Maryland*, 427 U.S. 463, 479 (1976)). The Ninth Circuit has clarified, however, that a warrant "need only be reasonably specific in its description of the objects of the search and need not be elaborately detailed." *United States v. Hayes*, 794 F.2d 1348, 1354 (9th Cir. 1986). "In the final analysis, '[t]he specificity required in a warrant varies depending on the circumstances of the case and the type of items involved." *U.S. v. Hernandez-Escarsega*, 886 F.2d 1560, 1567 (9th Cir. 1989) (quoting *Center Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 749 (9th Cir. 1989)).

The warrant for Smith's home authorized police to search for the following:

Evidence of the crimes of Encouraging Child Sexual Abuse and Sex Abuse I, including but not limited to: a red blanket and/or laying pad, any and all camera's [sic], both digital and 35 mm, any computer, cables, monitor, software and documentation needed to operate said computer; storage media, including floppy discs, hard disks or drives, tape cartridges, CD-ROM disks, DVD's, Type I and II compact flash cards, smart media cards, multimedia cards, secure digital cards,

memory sticks, XD cards, or microdrives; any modem, scanner, digital camera or imaging device; computer software designed to capture, store, or view images; any nude or sexually explicit pictures or images of persons who appear nude under the age of 18 and to seize and examine the same.

(Resp't Ex. 118.) Smith asserts that the inclusion of the phrase "including but not limited to" renders the warrant so broad as to be a "general warrant" that is "invalid in its entirety under the Fourth Amendment." (Pet'r's Reply at 8-9.) According to Smith, a proper challenge to the warrant on this basis would have resulted in the "suppression of *all* evidence obtained from the search[,]" substantially weakening the State's case against him. (*Id.*at 9.) This Court disagrees.

The inclusion of the phrase "including but not limited to" in a search warrant does not in and of itself render it a general warrant in violation of the Fourth Amendment. Rather, "'[i]ncluding, but not limited to' language may be permissible if it is clear that the police may search and seize only certain kinds of items related to a specific crime or type of criminal activity." *Sartin*, 262 F. Supp. 2d at 1161; *see also, e.g.*, *United States v. Reeves*, 210 F.3d 1041, 1046 (9th Cir. 2000) (holding that the inclusion of the words "may include, but is not limited to" and "other items" did not render a search warrant impermissibly overbroad because "the catch-all phrases . . . exist in the context of authorization for a search of 'evidence of the possession, manufacture, and delivery of the controlled substance methamphetamine[,]" which "adequately limits the scope of the search"); *United States v. Washington*, 797 F.2d 1461, 1472 (9th Cir. 1986) (finding that a warrant authorizing seizure of "records, notes, [and] documents indicating [the defendant's] involvement and control of prostitution activity including *but not limited to*, photographs, handwritten notes, [and] ledger books," was not impermissibly overbroad because it "effectively tells the officers to seize only items indicating prostitution activity") (emphasis in original).

PAGE 19 – OPINION AND ORDER

Here, the warrant at issue clearly instructed police to search for and seize "[e]vidence of the crimes of Encouraging Child Sexual Abuse and Sex Abuse I, including but not limited to" a list of specific items associated with those crimes. Although Smith claims that this language allowed for general "rummaging" through his belongings, the warrant specified the crimes at issue, effectively telling the officers to search for and seize only items indicative of such crimes. The warrant authorizing the search of Smith's home therefore was not a constitutionally impermissible general warrant on its face, and Smith's trial counsel could not successfully have challenged the admission of evidence seized from Smith's home on that basis alone.[9] Trial counsel thus was not constitutionally ineffective in failing to make such challenge, and postconviction counsel was not constitutionally ineffective in failing to raise the same, particularly in light of the ineffectiveness claims postconviction counsel did raise. *See White v. Nooth*, 770 Fed. App'x 412, 414 (9th Cir. 2019) (noting that in evaluating postconviction counsel's performance, the court must "recognize that the 'process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective . . . advocacy'").

For the reasons stated, Smith has not established that his underlying ineffective assistance of trial counsel claim is "substantial," and postconviction counsel therefore "could not have been

---

[9] This Court notes that Smith's extensive arguments in support somewhat conflate subclaim 12(A)(1) and subclaim 12(A)(2), despite his insistence that "[t]he two claims are . . . quite distinct." (Pet'r's Reply at 9.) As explained above, postconviction counsel raised subclaim 12(A)(2) in Smith's postconviction proceedings, but Smith failed to raise it on appeal. Subclaim 12(A)(2) therefore is procedurally defaulted, and Smith cannot overcome the default under *Martinez*. Thus, to the extent Smith points to trial counsel's failure to challenge the seizure of evidence beyond the scope of the warrant to support his underlying ineffectiveness claim under *Martinez*, this Court rejects those arguments, and considers argument only with respect to the underlying ineffectiveness claim at issue — which is that trial counsel was ineffective in failing to challenge the warrant as a general warrant based upon the inclusion of language that rendered it overbroad. (*Id.*)

ineffective for failing to raise the ineffective assistance of counsel claim in state court." *See Sexton,* 679 F.3d at 1161 (holding postconviction counsel could not have been ineffective for failing to raise ineffective assistance of counsel claims where trial counsel was not ineffective). Accordingly, Smith fails to demonstrate that his procedural default of subclaim 12(A)(1) is excused under *Martinez.*

### b.      Subclaims 12(B)-(E)

In subclaims 12(B)-(E) of the second claim for relief, Smith alleges that his trial attorneys were ineffective when they:

> (B) failed to object to the insufficiency of the child hearsay notice provided by the prosecution pursuant to Oregon Evidence Code (803)(18a), and failed to object when witnesses testified beyond the parameters of the limited notice provided;
>
> (C) "failed to appropriately object, take exception, or move to strike when prosecution witnesses, including without limitation Detective John Aubom, made impermissible comments on Mr. Smith's credibility[;]"
>
> (D) failed timely to move for a mistrial "when, before the jury, the prosecutor impermissibly challenged Mr. Smith to take the stand in his own defense as opposed to cross-examining the prosecution's witnesses[;]" and
>
> (E) "failed to appropriately object, take exception, move to strike, or move for a mistrial, when the prosecutor engaged in multiple instances of misconduct in closing argument[,]" including stating his own beliefs as to Smith's credibility and impermissibly impugning the integrity of defense counsel.

(Am. Pet. at 9-11; Pet'r's Br. at 23-25.)

Fair presentation required Smith to raise subclaims 12(B)-(E) to the Oregon Supreme Court in a procedural context in which it would assess the merits of his claims. Smith does not dispute that he did not include subclaims 12(B)-(E) in his petition for review to the Oregon Supreme Court, and thus Oregon's highest court did not have an opportunity to pass on the merits of those claims. (Resp't Ex. 169.) Smith therefore failed fairly to present subclaims 12(B)-(E) of the second claim for relief, and because he can no longer do so, they are procedurally defaulted. *See* OR. REV. STAT. § 138.510(3) (setting forth a two-year limitation period in which to file for postconviction relief);

PAGE 21 – OPINION AND ORDER

Or. Rev. Stat § 138.550(3) (instructing that all grounds for relief must be asserted in the original or amended postconviction relief petition unless the grounds could not reasonably have been raised). Smith provides no argument or authority on which this Court might excuse the default.

### 3.    Smith's Third and Fourth Claims for Relief — Ineffective Assistance of Appellate Counsel and Cumulative Error

In his third claim for relief, Smith alleges that appellate counsel rendered constitutionally ineffective assistance in several ways, including failing to raise as error "the prosecutor's impermissible challenging of Mr. Smith to take the stand in his own defense as opposed to cross-examining the prosecution's witnesses," and "the multiple instances of prosecutorial misconduct in closing argument." (Am. Pet. at 12-13.) In his fourth claim for relief, Smith alleges that "[w]hile any one particular error may not, when viewed individually, require a grant of relief, . . . the cumulative effect of the multiplicity of errors rendered his trial and revocation proceedings fundamentally unfair, had a substantial and injurious impact on the adjudication of guilt and sentencing, and requires relief from his conviction and sentence." (Am. Pet. at 14.)

Smith's third and fourth claims for relief are procedurally defaulted.[10] Smith does not dispute that he did not include these or the vast majority of his claims in his petition for review to the Oregon Supreme Court, and therefore failed to present them in a procedural context in which

---

[10] Respondent also argues that Smith failed to file the Amended Petition within the one-year statute of limitations, and that all claims in the Amended Petition that were not asserted in his initial petition — *i.e.*, Smith's third and fourth claims for relief — should be denied as untimely. (Resp. to Am. Pet. at 14-15.) Smith does not address Respondent's timeliness arguments in any of his briefing, and it is unclear whether his newly asserted claims relate back to his original petition under Federal Rule of Civil Procedure 15(c)(1)(B). Because it is clear upon review that Smith's third and fourth claims for relief are procedurally defaulted, and can be dismissed on that basis, this Court declines to address whether those claims also are subject to dismissal as untimely.

they would be considered on the merits. Because Smith no longer can present his third and fourth claims for relief to Oregon's highest court, they are procedurally defaulted.

Even if Smith need not exhaust his state remedies with respect to his claim of cumulative error, all but one of Smith's claims are procedurally defaulted, and this Court may not ignore the default to consider the cumulative impact of the errors alleged in those claims. Accordingly, even if Smith's fourth claim for relief is not procedurally defaulted, it necessarily must fail, and Smith presents no facts or authority to the contrary.

### 4.    Summary

Smith's first, third, and fourth claims for relief are procedurally defaulted in their entirety, and Smith has not alleged cause and prejudice to overcome the default, or that a miscarriage of justice will occur if this Court does not address the merits of those claims. In addition, Smith's second claim for relief is procedurally defaulted in part, and Smith fails to demonstrate cause under *Martinez* to excuse the default of subclaim 12(A)(1). Accordingly, this Court denies habeas relief as to Smith's first, third, and fourth claims for relief, and as to subclaims 12(A)(1), 12(A)(2), 12(B), 12(C), 12(D), and 12(E) of Smith's second claim for relief.

## II.    Ineffective Assistance of Counsel

In subclaim 12(A)(3) of Smith's second claim for relief, Smith alleges that trial counsel was ineffective in failing to move to suppress and later withdrawing any objection to the admission of evidence seized from Smith's bedroom "based on an agreement with the prosecutor, a stipulation pursuant to [OEC] 404(3)[.]" (Am. Pet. at 9; Pet'r's Br. at 22-23.) As explained above, Smith properly exhausted this claim in his state postconviction proceedings.

///

///

### A.      Legal Standards

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prohibits relitigation of any claim adjudicated on the merits in state court unless such adjudication resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs if the state court correctly identifies the governing legal principle but misapplies that principle to the facts at hand. *See id.* at 407 (holding that "a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"). The "unreasonable application" clause requires the state court's decision to be more than merely erroneous or incorrect. *See id.* at 411 (noting that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"). Rather, the state court's application of clearly established federal law must be objectively unreasonable. *See id.* at 409 (instructing that a federal habeas court making the 'unreasonable application' inquiry should

ask whether the state court's application of clearly established federal law was objectively unreasonable").

A federal habeas court may not disturb a state-court decision on factual grounds unless the state court's decision was based on an unreasonable determination of the facts in light of the evidence before it. 28 U.S.C. § 2254(d)(2). Under the "unreasonable determination" clause, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Ninth Circuit has clarified that when a petitioner challenges the substance of a state court's findings, the federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.), *cert denied*, 543 U.S. 1038 (2004).

"Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Where a state court decision is issued without explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* Where, however, the highest state court issues a decision on the merits unaccompanied by its reasons for the decision, a federal habeas court must "look through" to the last reasoned decision issued in a lower state court, and presume the unexplained decision adopted the same reasoning. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

The AEDPA thus imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the

doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (simplified); *see also White v. Wheeler*, 577 U.S. 73, 76-77 (2015) (acknowledging that the "AEDPA, by setting forth necessary predicates before a state-court judgment may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court") (simplified). "The petitioner carries the burden of proof." *Pinholster*, 563 U.S. at 181.

The clearly established federal law governing ineffective assistance of counsel claims is set forth in *Strickland*. *See Williams*, 529 U.S. at 391 (noting that "[i]t is past question" that the rule established in *Strickland* is clearly established federal law determined by the Supreme Court of the United States). To establish a claim of ineffective assistance under *Strickland*, a habeas petitioner must satisfy a two-pronged test. First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 686. Such a showing requires the petitioner to overcome a strong presumption the challenged conduct falls within the "wide range of reasonable professional assistance; that is the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. The first prong thus is satisfied only if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

Second, a petitioner must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* Therefore, it is not enough if counsel's errors had only "some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must have been "so serious as to deprive [the

petitioner] of a fair trial, a trial whose result is reliable." *Id.* In making the prejudice determination, the court must "consider the totality of the evidence before the judge or jury." *Id.* at 695.

Analyzing an ineffective assistance of counsel claim under the AEDPA is "all the more difficult" because both standards are "highly deferential and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). The question under such circumstances "is not whether counsel's actions were reasonable." Rather, the court must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

**B.      Analysis**

As noted, Smith alleges trial counsel was ineffective in connection with a pretrial agreement stipulating to the admissibility of evidence seized from Smith's bedroom. Specifically, Smith asserts that trial counsel agreed to withdraw all objections to the admissibility of irrelevant and prejudicial evidence based on an agreement with the prosecutor that "provided no real benefit to Mr. Smith." (Pet'r's Br. at 22.) Because he received no legal or tactical benefit from the agreement, Smith argues that trial counsel had no strategic reason to "drop all objections to the introduction of evidence which . . . was of limited probative value particularly when weighed against its prejudicial effects." (*Id.* at 22-23.)

**1.      Trial Counsel's Stipulation to the Admission of Evidence Under OEC 404**

Before trial, the prosecutor moved to admit certain evidence seized from Smith's bedroom pursuant to Oregon Evidence Code ("OEC") 404(4)[11], including (1) hundreds of photos of little

_____

[11] OEC 404(4) provides that "[in] criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible if relevant except as otherwise provided by" certain statutes,

PAGE 27 – OPINION AND ORDER

girls; (2) little girls' clothing; and (3) a list of sex offenders residing in the area. (Resp't Exs. 130,

131 at 2-4.) The prosecutor clarified that "the aim of the evidence is not to show that [Smith] has

a criminal character[,]" but rather "to establish that [Smith] took the photographs of [B] with the

intent of stimulating his lust or sexual desires[,]" and "to establish the absence of mistake or

accident in [Smith's] touching of B's vagina."[12] (Resp't Ex. 131 at 3-4.) The prosecutor explained:

> [B]ecause [Smith] had approximately 200-300 photos of little girls located in his bedroom, some of which focus on the vaginal or bottom areas of the little girls, a jury could infer that [Smith] enjoys looking at sexualized photographs of little girls. . . . Because [Smith] had little girl clothing in his bedroom a jury could infer that [Smith] has a sexual interest in little girls. . . . Because [Smith] had a list of local sex offenders in his bedroom a jury could infer that he is interested in trading sexually explicit materials of children. From [these] inference[s] a jury could conclude that [Smith] took the nude photographs of [B] with the intent of stimulating his lust or sexual desires.
> . . . .
> [Also,] [t]he inference that the jury is invited to draw from [Smith's] possession of approximately 200-300 photographs of little girls, some focusing on their vaginal and bottom areas, the little girls clothing and the list of local sex offenders, is that [Smith] touched [B's] vagina with a sexual purpose, and not innocently or accidentally. The combination of proposed evidence shows that [Smith] is sexually attracted to little girls, and therefore his touching of [B's] vagina was not accidental.

(*Id.* at 8, 11.)

The prosecutor also moved to exclude evidence that B previously had accused a YMCA

daycare worker of touching her vagina, and that B's mother ultimately requested that police stop

investigating the claim because she worried that B was confused about what happened. (Resp't

Ex. 133.) The prosecutor argued that such evidence should be excluded under OEC 608(2), which

---

the rules of evidence with relating to privilege and hearsay, and the Oregon and United States Constitutions.

[12] Under OEC 404(3), evidence of a defendant's other acts is admissible if relevant for a non-character purpose "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

provides, in part, that "specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross of [a] witness" for the purpose of attacking his or her credibility. (Resp't Ex. 133 at 2.) Although the prosecutor acknowledged that the Oregon Court of Appeals had created certain exceptions to that rule in *State v. LeClair*, 83 Or. App. 121, 130 (1986), he argued that none of those exceptions applied. (Resp't Ex. 133 at 2-4.) Trial counsel thereafter filed a competing motion seeking leave to admit evidence regarding B's previous allegation of sexual abuse. (Resp't Exs. 140, 141.)

The trial court held an omnibus hearing on the motions. Eventually, the prosecutor invited the defense to stipulate to the introduction of numerous photographs found in Smith's bedroom, noting that such evidence was consistent with the defense's theory that Smith was simply an avid photographer who enjoyed photographing children. (Tr. 118) In response, trial counsel indicated that the defense would not only stipulate to the admissibility of the photographs, but "would consider granting the State's motion under [OEC] 404(4) in its entirety if . . . [it] would in turn grant our motion as far as the [previous allegation of sexual abuse] evidence[.]" (Tr. 118.)

After a lengthy discussion as to whether evidence of B's previous allegation would be limited to the cross-examination of B, or if other witness testimony would be permitted, the parties came to an agreement. (Tr. 119, 121-35.) In exchange for trial counsel's stipulation that the "300-500 photographs of little girls found in [Smith's] bedroom, are relevant and admissible, under OEC 404(4)[,]" the prosecutor agreed that the defense could "cross-examine [seven] year old [B] regarding a prior allegation of sexual abuse in 2007, when [B] was approximately 4 years old[.]" (Resp't Exs. 148 at 2; 149 at 2.) The agreement also allowed the defense to "put on an offer of proof to the Court and argue that extrinsic evidence of the falsity of the prior allegation is

admissible" if B stated that she did not remember or if she denied making the allegation altogether.

(Resp't Exs. 148 at 2; 149 at 1-2.)

At trial, Smith's trial attorneys cross-examined B as to her previous allegation of sexual abuse, but failed to elicit the testimony they had hoped:

Q: . . . Do you remember . . . talking with your mom about a woman at the YMCA touching you?

A: There was no one touching me.

Q: No one touched you at the YMCA?

A: No.

Q: Do you remember telling your mom that somebody was touching you at the YMCA?

A: No.

Q: You don't remember that? Do you remember Ms. Marjorie?

A: No.

Q: You don't remember that name?

A: (No audible response)

Q: Okay. Do you remember -- well anyway, so you -- you said as far as you remember nobody touched you at the YMCA?

A: No.

Q. And I guess I'm being -- when I say "touch you" I mean touch your privates; right?

A: Yeah.

Q. Nobody touched your privates at the YMCA?

A: No.

Q: And you never tell -- you don't remember telling your mom or anybody else that somebody did touch you at the YMCA?

A: Yeah.

Q: And you don't remember Ms. Marjorie?

A: No, I don't remember her.

(Tr. 385-87.) Trial counsel thereafter made an offer of proof outside of the jury's presence, presenting to the trial court additional evidence of B's prior allegation and arguing that such evidence was admissible. (Tr. at 392-439.) The trial court rejected those arguments and held that extrinsic evidence was not admissible to demonstrate the falsity of B's previous claim under Oregon law. (Tr. 442-445.) The jury thus heard only that B did not remember being sexually abused by anyone at the YMCA.

## 2.    The Postconviction Court's Decision

In his postconviction proceeding, Smith alleged that trial counsel was ineffective by improperly stipulating to the admission of evidence pursuant to OEC 404(3); failing to argue against the State's pretrial motion; and failing to file his own motion to suppress the hundreds of photographs of clothed little girls recovered from Smith's bedroom. (Resp't Ex. 114 at 5.) Smith asserted that trial counsel should have challenged the admission of the photographs because they were not relevant under 404(4), and even if they were, "they should have been excluded because their admission would have constituted unfair prejudice, mislead the jury, and caused undue delay in the proceedings in that their presentation was cumulative evidence under OEC 403." (Resp't Ex. 116 at 10.)

In opposition, the State submitted, among other things, the affidavit of trial counsel, which explained the decision to stipulate to the admissibility of the evidence recovered from Smith's bedroom:

. . . . [M]y co-counsel and I considered opposing the State's motion to allow the evidence, and possibly filing a pre-trial motion to exclude the evidence. Our

decision, however, with which Mr. Smith agreed at the time, was to not pursue further motion practice on that issue because we continued to doubt the success of the motion on the merits, and preferred to have the State's stipulation to the evidence we wanted to explore. Namely, testimony about a previous allegation of sexual abuse by the alleged victim at the YMCA.

(Resp't Ex. 161 at 2.)

After a brief evidentiary hearing, the postconviction court denied relief. (Resp't Exs. 165, 166.) In a written judgment, the postconviction court noted that Smith failed to establish the merits of his ineffectiveness claim, explaining:

Trial attorney did not file a motion to suppress for a strategic reason. The defense wanted to talk about a false claim made by [B], but it was not likely to be admissible. Trial attorney then worked out an agreement with the DA that in exchange for a stipulation to admissibility of the photos, the DA wouldn't object to limited testimony about the false accusation. As part of the defense, trial attorney planned on telling the jury that [Smith]'s business includes photography of all sorts, so he has cameras and usually has one with him. The photos helped that argument and since they were not offensive photos, they did not hurt. This was reasonable trial strategy.

(Resp't 166 at 1.)

Smith contends that the postconviction court's decision denying relief on his ineffectiveness claim contained a critical flaw — namely, that "it wholly fails to identify what agreement was reached with the prosecutor, and what evidence was admitted pursuant to that agreement which would not have been otherwise admissible under Oregon law." (Pet'r's Reply at 2-3.) Specifically, Smith argues that he was entitled to cross-examine B under *LeClair* and its progeny because there was "substantial evidence" that B's previous allegation was false, and that because trial counsel failed to get the agreement he sought — *i.e.*, an agreement allowing the defense to introduce extrinsic evidence of that falsity — "trial counsel's waiver of the challenges to the admissibility of the prosecution's evidence provided absolutely no benefit to . . . Smith." (Pet'r's Br. at 2, 17.) Smith thus argues that to the extent trial counsel can be said to have made a

PAGE 32 – OPINION AND ORDER

strategic decision in this matter, "his decision was based on a misunderstanding of the law and the facts[,]" and therefore "the postconviction court's ruling is unreasonable in light of the evidence presented[.]" (Pet'r's Reply at 7-8.)

Smith has not shown that the postconviction court's ruling was objectively unreasonable. As an initial matter and despite his assertion to the contrary, Smith was not unequivocally entitled to cross-examine B about her previous allegation of sexual abuse. Under OEC 608(2), "[s]pecific instances of conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, . . . may not be proved by extrinsic evidence[,]" nor may such instances "even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness." The text of OEC 608(2) therefore prohibited the defense from cross-examining B about a prior false allegation of sexual abuse. *See LeClair*, 83 Or. App. at 126 (noting that "specific instances of conduct" under OEC 608(2) includes false statements).

As the parties both recognize, however, the Oregon Court of Appeals crafted judicial exceptions to this rule in *LeClair*, holding that:

> . . . regardless of the prohibitions of OEC 608, the Confrontation Clause of Article 1, section 11, requires that the court permit a defendant to cross-examine the complaining witness in front of the jury concerning other accusations she has made if 1) she has recanted them; 2) the defendant demonstrates to the court that those accusations were false; or 3) there is some evidence that the victim has made prior accusations that were false, unless the probative value of the evidence which the defendant seeks to elicit on the cross-examination (including the probability that the false accusations were in fact made) is substantially outweighed by the risk of prejudice, confusion, embarrassment or delay.

83 Or. App. at 130.

Smith apparently relies on the third *LeClaire* exception, noting that there was "some evidence" that B's previous allegation was false. (Pet'r's Reply at 6.). Such evidence included that B reported to her mother in January 2007 that a daycare worker at the YMCA had touched her

PAGE 33 – OPINION AND ORDER

vagina; that the daycare worker in question denied it; that B was never interviewed; and that B's mother left the investigating officer a voicemail in which she stated that she was "'not sure if [B] told the truth' about the allegation and that if it were easier, she wanted the investigation dropped." (Resp't Ex. 143 at 1-2.)

There is no evidence that B recanted her prior allegation, nor does the evidence clearly demonstrate B's prior allegation was false. In fact, the evidence on which Smith relies shows only that B reported an instance of inappropriate touching to her mother, who later had doubts as to the accuracy of B's reporting and misgivings about pursuing the matter criminally. Even assuming that this constitutes "some evidence" from which the trial court could have found that B's prior accusation was false, the trial court still could have concluded that the risk of prejudice, confusion, embarrassment, or delay outweighed the probative value of such evidence, and thus could have prohibited Smith from cross-examining B to neutralize those concerns. *See, e.g.*, *LeClair*, 83 Or. App. at 131 (affirming trial court's decision to prohibit the defendant from cross-examining the victim where there was some evidence that the victim previously made false allegations, but "inquiry into each incident could [have] result[ed] in significant delay and jury confusion, because there would [have] be[en] a mini-trial to determine if each incident actually occurred"). Given the conflicting and somewhat ambiguous nature of the evidence presented, and the trial court's discretion to limit cross-examination, this Court cannot conclude that Smith was categorically entitled to cross-examine B about the prior allegation in the absence of the agreement between trial counsel and the prosecutor. Indeed, the postconviction court similarly concluded that evidence about B's allegedly false accusation "was not likely to be admissible" without a stipulation by the prosecutor and, as Respondent points out, that conclusion is binding. *See McGuire*, 502 U.S. at

PAGE 34 – OPINION AND ORDER

67-68 (emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

In light of the risk that the trial court would bar any questioning about B's prior accusation if the parties litigated the issue in the regular course, it was not unreasonable for trial counsel to pursue an agreement that would guarantee an opportunity for such questioning. B's testimony was essential to the State's case at trial, and trial counsel ensured that he could attempt to challenge B's credibility in exchange for his stipulation to the admissibility of the hundreds of photographs of fully clothed children found in Smith's bedroom — photographs which otherwise were likely to have been admitted and which were consistent with the defense's theory that Smith was an avid photographer. As the postconviction court concluded, "[t]his was reasonable trial strategy[.]" That B's cross-examination ultimately yielded testimony that was of little help to the defense does not negate the benefit of the bargain, as trial counsel could not have known how B would testify until she was questioned at trial. The postconviction court's determination that trial counsel was not ineffective thus was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement[,]" *Richter*, 562 U.S. at 103, and its decision denying Smith's claim is entitled to deference. *See Strickland*, 466 U.S. at 690 (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Smith therefore is not entitled to habeas relief on subclaim on 12(A)(3).

## III.    Evidentiary Hearing

Smith requests an evidentiary hearing "at which proof may be offered concerning each of the allegations in the Petition." (Am. Pet. at 15.) Based on the foregoing, however, an evidentiary hearing is neither necessary nor in the interests of judicial economy. *See Schriro v Landrigan*, 550

U.S. 465, 474 (2007) (where the record in the case precludes habeas relief, a district court is not required to hold an evidentiary hearing); *see also Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir.1998) (evidentiary hearing not required on issues that can be resolved by reference to state court record). Accordingly, Smith's request for an evidentiary hearing is denied.

## CONCLUSION

Based on the foregoing, the Amended Petition for Writ of Habeas Corpus (ECF No. 37) is DENIED, and this proceeding is DISMISSED, with prejudice. Petitioner has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this ___27th___ day of September, 2021.

Karin J. Immergut
United States District Judge